921 A.2d 1079

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. RAHMIL O'NEAL, DEFENDANT–APPELLANT AND CROSS–RESPONDENT.

Argued October 31, 2006—Decided May 22, 2007.

602

604

*Jean B. Bennett,* Designated Counsel, argued the cause for appellant and cross-respondent (*Yvonne Smith Segars,* Public Defender, attorney).

*Steven A. Yomtov*, Deputy Attorney General, argued the cause for respondent and cross-appellant (*Stuart Rabner*, Attorney General of New Jersey, attorney; *Mr. Yomtov* and *Natalie A. Schmid Drummond*, Deputy Attorney General, of counsel and on the briefs).

Justice WALLACE, JR. delivered the opinion of the Court.

Defendant was convicted of selling cocaine in a school zone. The Appellate Division rejected defendant's claim that the police violated his constitutional rights when they asked him a question without first giving him *Miranda*[1] warnings, but found that defendant established a prima facie claim of ineffective assistance of counsel for defense counsel's failure to file a motion to suppress the cocaine. The panel remanded for a hearing on the Fourth Amendment suppression motion, but held that if the trial court denied the motion, the conviction and sentence would be affirmed. Defendant filed a petition for certification, and the State filed a cross-petition. We granted both petitions. We now hold that, based on the observations made by the law enforcement officers, there was probable cause to search and arrest defendant. We also hold that the police officer's question to defendant that elicited defendant's response without prior *Miranda* warnings violated *Miranda*, but was harmless under the circumstances. We reverse and remand to reinstate the judgment of conviction and sentence.

I.

At approximately 7:15 p.m. on August 28, 2002, Newark Police Officers Patrick Cantalupo and Bobby Bullock, riding in an unmarked police car and wearing plainclothes, were patrolling a high-crime area near Lincoln Park. They observed defendant Rahmil O'Neal and another man standing in front of a restaurant. The man gave money to defendant in exchange for an unknown

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

object. Cantalupo believed that a drug transaction had taken place and decided to investigate further. He turned the car around and parked across the street from defendant's location.

Several minutes later, Cantalupo and Bullock watched as a second man approached and engaged in conversation with defendant. The man handed cash to defendant and defendant knelt down on his left knee. Defendant then reached in his right sock, removed a clear plastic bag containing black-capped vials that the officers suspected were filled with cocaine, and handed a vial to the man. Cantalupo and Bullock immediately exited the car to approach the two men. Although they were in plainclothes, the police officers wore badges around their necks and announced their presence. The unknown male retreated into a doorway adjacent to the restaurant and locked the metal door. When the police officers were unable to open the metal door, they turned their focus to defendant, who was pretending to use a nearby pay phone.

Cantalupo asked defendant, "what's going on?" Defendant responded that he did nothing wrong. Bullock directed Cantalupo to check the bulge around defendant's right ankle. Cantalupo patted the area, felt the bulge, and asked defendant what was in his sock. Defendant admitted it was cocaine. Cantalupo then searched defendant and retrieved a clear plastic sandwich-sized bag containing forty-nine black-capped vials of cocaine from the area of defendant's right ankle. The officer placed defendant under arrest. A more thorough search of defendant revealed thirteen dollars in his pocket.

Defendant was charged with third-degree possession of cocaine, *N.J.S.A.* 2C:35–10a(1); third-degree possession of cocaine with intent to distribute, *N.J.S.A.* 2C:35–5a(1) and –5b(3); and third-degree possession of cocaine within 1000 feet of school property, *N.J.S.A.* 2C:35–7. Defendant filed a motion to suppress the drugs, but later withdrew that motion in a pretrial memorandum that was executed by defendant, his counsel, the assistant prosecutor, and the trial court.

On the first day of trial, defense counsel advised the trial court that a hearing was not required to determine the admissibility of defendant's statement to the police that he had cocaine in his possession. The following day, defense counsel changed his position and requested that the trial court hold a hearing to consider suppressing defendant's incriminating statement made in response to the police's inquiry regarding the bulge on his right ankle. Counsel claimed that the statement was elicited from defendant without *Miranda* warnings and should be suppressed. The trial court granted the request to hold a hearing.

Cantalupo was the sole witness at the hearing. He testified that he observed defendant distribute drugs on two occasions, and that during the second he saw defendant remove a vial of suspected cocaine from his sock and give it to an unknown man in exchange for money. After he and Bullock approached defendant, Cantalupo explained that Bullock advised him to check the bulge on defendant's right ankle. The following exchange between the prosecutor and Cantalupo then took place:

Q. How did you respond?

A. Oh, not knowing if it could be a weapon, it could be anything as far as a *Terry* frisk goes. I immediately patted the area and I—I asked, you know, what's this?

Q. And what did he say?

A. And that's when he responded, a bag of cocaine.

Q. And did you recover the bag?

A. Absolutely.

Q. Okay. And where did the bag turn—turn on top? Did the bag have anything inside of it?

A. Yes. It was a clear plastic bag, almost like a sandwich bag size with 49 black capped vials of cocaine or I, at the time, suspected cocaine.

On cross-examination, defense counsel asked Cantalupo if, based on the two transactions he observed, probable cause existed to arrest defendant. Cantalupo replied that he thought he "had enough suspicion to approach" defendant. On re-direct, the prosecutor asked Cantalupo if he was able to see what was in the bag when defendant knelt down on his knee. Cantalupo replied, "several black capped vials ... [s]uspected cocaine." When the prosecutor asked Cantalupo if the cocaine alone gave him probable

cause to place defendant under arrest, Cantalupo replied, "[c]orrect." Cantalupo agreed that when he approached defendant "he was basically going to ... place[ ] [defendant] under arrest." On re-cross-examination, Cantalupo acknowledged that he did not read defendant his *Miranda* rights prior to asking defendant what was in his sock.

Defense counsel argued that defendant was in custody and any statement by defendant must be suppressed because the police failed to provide him with *Miranda* warnings prior to asking him what was in his sock. Focusing on whether defendant was in custody when he made the incriminating statement, the trial court explained that "the issue still is what a reasonable person, innocent of crime in the defendant's position, would have thought." The trial court found that "a reasonable person, innocent of crime, would not have thought ... that it was a custodial interrogation, that he was in custody," and therefore *Miranda* warnings were not required. The trial court denied defendant's motion to suppress his statement.

Before the jury, Cantalupo and Bullock testified consistent with the testimony Cantalupo presented at the *Miranda* hearing. The State also called Detective Reginald Holloway of the Bureau of Narcotics of the Essex County Sheriff's Department as an expert witness in the area of street-level narcotics. Holloway opined that each of the transactions witnessed by Cantalupo and Bullock was an illegal hand-to-hand narcotics transaction. He also opined that the forty-nine vials of cocaine recovered from defendant "would be possessed for the intent to further distribute for monetary gain[.]"

After the trial court denied defendant's motion for judgment of acquittal, defendant testified on his own behalf. Defendant denied he had any drugs on him when he was arrested and denied that he ever told the police that the bag of cocaine belonged to him. Defendant claimed he was on his way to visit a friend when he stopped to shake hands with a man who was standing in front of a restaurant at 77 Lincoln Park. Defendant said that the man ran into an adjacent building when the police appeared. Defendant

surmised that the cocaine the police found must have belonged to the other man because that man ran when the police approached.

The jury convicted defendant on each count. After merger, the trial court sentenced defendant to a four-year custodial term with three years of parole ineligibility. Defendant appealed. In an unpublished decision, the Appellate Division held that defendant's initial detention was an investigatory stop and that *Miranda* warnings were not required. However, the panel found merit in defendant's claim that he received ineffective assistance of counsel when defense counsel failed to file a motion to suppress the cocaine.[2] Because the State never had the opportunity to justify the search, the panel remanded for a hearing on the motion to suppress. The panel concluded that if the trial court subsequently granted defendant's motion to suppress the drugs, the judgment of conviction would be vacated, but if the court denied the motion, defendant's conviction and sentence would be affirmed. The panel also rejected defendant's challenge to his sentence.

Defendant filed a petition for certification, and the State filed a cross-petition. We granted both petitions. 186 *N.J.* 256, 893 *A.*2d 722 (2006).

## II.

Defendant argues that the seizure of the drugs during the pat-down search violated his constitutional rights and that his statement to the police must be suppressed because it was elicited after he was in custody and prior to his receipt of *Miranda* warnings. As a result of his counsel's failure to seek to suppress the drugs that were allegedly seized in violation of the federal and state constitutions, defendant further contends that he was denied the effective assistance of trial counsel. Finally, defendant contends that his sentence was excessive.

---

[2] Apparently, the panel was unaware that defendant filed a motion to suppress the cocaine that was subsequently withdrawn.

The State counters that the drugs seized from defendant are admissible either as the result of a valid investigatory stop or as a search incident to an arrest based on probable cause. The State argues that defendant was not in custody at the time he told the police he had cocaine, and therefore, *Miranda* warnings were not required. Further, the State urges that the Appellate Division erred in looking to the subjective intent of the police rather than applying an objective test to determine whether the seizure of the drugs from defendant was reasonable. The State also contends that the Appellate Division erred when it determined that defendant's trial counsel was ineffective for failing to file a motion to suppress and when it remanded for a hearing on that issue.

### III.

### A.

Before addressing defendant's claim that the police violated his constitutional rights when they failed to give him *Miranda* warnings prior to questioning him about the bulge in his right sock, we must first decide whether defendant's stop was an investigatory stop or was a search and arrest based on probable cause. Because no warrant was sought for the search and arrest of defendant, the State bears the burden of showing that the warrantless seizure " 'falls within one of the few well-delineated exceptions to the warrant requirement.' " *State v. Maryland,* 167 *N.J.* 471, 482, 771 *A.*2d 1220 (2001) (quoting *State v. Citarella,* 154 *N.J.* 272, 278, 712 *A.*2d 1096 (1998), *and* citing *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043, 36 *L.Ed.*2d 854, 858 (1973)). The State has the burden of proof to demonstrate by a preponderance of the evidence that the warrantless seizure was valid. *State v. Pineiro,* 181 *N.J.* 13, 20, 853 *A.*2d 887 (2004).

The two constitutionally permissible forms of police encounters that we need consider in this case are the investigatory

stop, referred to as a *Terry*[3] stop, and the stop occasioned by probable cause. The standard for a *Terry* stop "is lower than the standard of probable cause necessary to justify an arrest." *State v. Nishina*, 175 *N.J.* 502, 511, 816 *A.2d* 153 (2003). The police may conduct a *Terry* stop if the "specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." *Ibid.* (citation and internal quotation marks omitted). That is, "would the facts available to the officer at the moment of the seizure or the search [justify a person] of reasonable caution in the belief that the action taken was appropriate?" *Terry, supra,* 392 *U.S.* at 21–22, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906 (citations and internal quotation marks omitted).

█ The second encounter we need consider is one based on the probable cause standard. In *State v. Moore*, we described that standard as follows:

> The probable cause standard is a well-grounded suspicion that a crime has been or is being committed. Probable cause exists where the facts and circumstances within ... [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed. The substance of all the definitions of probable cause is a reasonable ground for belief of guilt.
>
> [181 *N.J.* 40, 45–46, 853 *A.2d* 903 (2004) (alterations in original) (citations and internal quotation marks omitted).]

The totality of the circumstances must be considered in determining whether there is probable cause. *Id.* at 46, 853 *A.2d* 903. In short, the court must "make a practical, common sense determination whether, given all of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Ibid.* (quoting *Illinois v. Gates*, 462 *U.S.* 213, 238, 103 *S.Ct.* 2317, 2332, 76 *L.Ed.*2d 527, 548 (1983)).

---

[3] *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968).

## B.

 Applying those principles to the present case, we conclude the police had probable cause to arrest defendant. As noted, Officers Bullock and Cantalupo observed a suspected drug transaction in a high-crime area before they moved to a closer position and watched defendant engage in a second drug transaction. They saw defendant remove a clear plastic bag containing black-capped vials of suspected cocaine from the right ankle of his pants and hand a vial to a man in exchange for money. The police, having observed at least one and possibly two drug transactions, had reasonable grounds to believe that defendant had committed a criminal offense.

We reached a similar conclusion with less compelling facts in *Moore*. In that case, the police observed a group of men in a high-crime area. *Id.* at 43, 853 *A.*2d 903. At one point, the defendant and another man left the group and walked over to the rear of a delicatessen where they met with a third person. *Ibid.* The defendant and his companion handed currency to the third person and received a small item in exchange. *Ibid.* We held that the "observations by the law enforcement officers in the high-crime area supported probable cause to arrest defendant, search him, and seize the suspected drugs incident to that arrest." *Id.* at 47, 853 *A.*2d 903.

The State urges that the Appellate Division misinterpreted our law in ruling that the evidence did not justify a search incident to arrest because the police did not have the subjective intent to arrest defendant. The State argues that it is not the subjective intent or state of mind of the officers, but rather, whether the seizure of defendant by the officers was objectively reasonable. We agree that the standard is an objective one.

 Recently, the United States Supreme Court commented on the relevance of a police officer's subjective motivations. The Court explained that: "Our cases have repeatedly rejected this approach. An action is 'reasonable' under the Fourth Amend-

ment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.' The officer's subjective motivation is irrelevant." *Brigham City v. Stuart,* —— *U.S.* ——, ——, 126 *S.Ct.* 1943, 1948, 164 *L.Ed.*2d 650, 658 (2006) (alteration in original) (citations omitted). Moreover, we have explained that "the proper inquiry for determining the constitutionality of a search-and-seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his or her underlying motives or intent." *State v. Bruzzese,* 94 *N.J.* 210, 219, 463 *A.*2d 320 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984). Although an officer may testify to his or her subjective intent, the crucial inquiry is whether the officer's conduct was objectively reasonable.

In the present case, the record is sufficient to decide the Fourth Amendment issues. We agree with the State's alternative argument that based on the totality of the circumstances, when viewed objectively, Bullock and Cantalupo had probable cause to search and arrest defendant. After the police stopped defendant, they could have immediately placed him under arrest, searched him, and seized the bag of drugs as a search incident to a lawful arrest. *See State v. Eckel,* 185 *N.J.* 523, 530, 888 *A.*2d 1266 (2006) (citing *Chimel v. California,* 395 *U.S.* 752, 762–63, 89 *S.Ct.* 2034, 2040, 23 *L.Ed.*2d 685, 694 (1969)). The fact that the police searched and removed the drugs before placing defendant under arrest does not alter the outcome. When the police search an individual before placing him under arrest "as part of a single uninterrupted transaction, it does not matter whether the arrest precedes the search." *State v. Bell,* 195 *N.J.Super.* 49, 58, 477 *A.*2d 1272 (1984) (citing *State v. Doyle,* 42 *N.J.* 334, 343, 200 *A.*2d 606 (1964)). It is the "right to arrest," rather than the actual arrest that "must pre-exist the search." *Doyle, supra,* 42 *N.J.* at 342, 200 *A.*2d 606. As long as the right to arrest pre-existed the search, and the "arrest is valid independently of, and is not made to depend on, the search or its result," the search will not be

invalidated "simply because in precise point of time the arrest does not precede the search." *Id.* at 343, 200 *A.2d* 606; *see also Rawlings v. Kentucky,* 448 *U.S.* 98, 111, 100 *S.Ct.* 2556, 2564, 65 *L.Ed.2d* 633, 645–46 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search ..., we do not believe it particularly important that the search preceded the arrest rather than vice versa."); *Moore, supra,* 181 *N.J.* at 47, 853 *A.2d* 903 (holding that search and seizure incident to arrest was proper because probable cause existed after police observed drug transaction in high-crime area). We conclude that the police had probable cause to arrest defendant for a drug offense, and the seizure of the drugs during the search that preceded the arrest was lawful.

## IV.

We turn now to defendant's contention that his oral statement to the police during the pat down was in violation of his *Miranda* rights. Specifically, defendant argues that it was a violation of his rights for the police to ask him an accusatory question while in custody and prior to being administered *Miranda* warnings.

## A.

In general, *Miranda* "warnings must be given before a suspect's statement made during custodial interrogation [may] be admitted in evidence." *Dickerson v. United States,* 530 *U.S.* 428, 431–32, 120 *S.Ct.* 2326, 2329, 147 *L.Ed.2d* 405, 412 (2000). In *Miranda, supra,* the Court defined "custodial interrogation" as questioning initiated by law enforcement "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.2d* at 706. The determination whether a suspect is in "custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 *U.S.* 318, 323, 114 *S.Ct.* 1526, 1529, 128 *L.Ed.2d* 293,

298 (1994). That is, a police officer's "unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 *U.S.* 420, 442, 104 *S.Ct.* 3138, 3151, 82 *L.Ed.*2d 317, 336 (1984) (footnote omitted); *see State v. P.Z.*, 152 *N.J.* 86, 103, 703 *A.*2d 901 (1997) (noting that "critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors") (citations omitted).

As noted above, based on the observations of the police, a reasonable police officer would have believed he or she had probable cause to arrest defendant for a drug transaction and would not have permitted defendant to leave. Similarly, a reasonable person in defendant's position, based on the nature of the police encounter, would not have believed that he was free to leave. We conclude that defendant was in custody when Cantalupo asked him, prior to administering *Miranda* warnings, what was in his sock. Consequently, defendant's reply that he had cocaine in his sock should have been suppressed.

Nevertheless, we are satisfied that the failure to suppress defendant's admission was harmless beyond a reasonable doubt. The police had probable cause to search and arrest defendant prior to asking the offending question and would have discovered the cocaine when they searched the sock. The fact that defendant told the police what they were about to discover had no bearing on the legality of the seizure of the cocaine. Consequently, the failure to suppress defendant's admission that he had cocaine in his sock was harmless. *See R.* 2:10–2.

### B.

This case presents an opportunity to provide guidance concerning the safety exception to *Miranda*. That exception is

based on the "objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." *New York v. Quarles*, 467 *U.S.* 649, 659 n. 8, 104 *S.Ct.* 2626, 2633, 81 *L.Ed.*2d 550, 559 (1984). It is a narrow exception that "will be circumscribed by the exigency which justifies it." *Id.* at 658, 104 *S.Ct.* at 2633, 81 *L.Ed.*2d at 559. Moreover, the United States Supreme Court expressed that "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." *Id.* at 658–59, 104 *S.Ct.* at 2633, 81 *L.Ed.*2d at 559.

Although we recently applied the principles of *Quarles* in finding an emergency-aid exception to *Miranda, see State v. Boretsky,* 186 *N.J.* 271, 283, 894 *A.*2d 659 (2006), we have not previously considered the application of a safety exception in a case like the present one. Other jurisdictions have applied a safety exception to *Miranda.*

In *United States v. Shea,* 150 *F.*3d 44 (1st Cir.), *cert. denied,* 525 *U.S.* 1030, 119 *S.Ct.* 568, 142 *L.Ed.*2d 473 (1998), the police arrested the defendant for his suspected role in an attempted robbery. *Id.* at 47. Prior to giving *Miranda* warnings to the defendant, one of the police officers asked the defendant if he had any weapons or needles on him that could harm the officer. *Id.* at 48. The trial court permitted the question and answer at trial. *Ibid.* On appeal, the United States Court of Appeals for the First Circuit affirmed, concluding that the safety exception to *Miranda* applied. *Ibid.; see also United States v. Carrillo,* 16 *F.*3d 1046, 1049–50 (9th Cir.1994) (finding question by police whether defendant had needles on his person was within safety exception); *United States v. Edwards,* 885 *F.*2d 377, 384 (7th Cir.1989) (approving police officer's question whether drug dealer had weapon without first giving *Miranda* warnings); *State v. Stephenson,* 350 *N.J.Super.* 517, 796 *A.*2d 274 (App.Div.2002) (noting that safety exception to *Miranda* may apply when there is a compelling and exigent need to protect public or police).

 We conclude that in limited circumstances, based on an "objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon[,]" a safety exception to *Miranda* is appropriate. *Quarles, supra,* 467 *U.S.* at 659 n. 8, 104 *S.Ct.* at 2633, 81 *L.Ed.*2d at 559. In such circumstances, the police must specifically frame the question to elicit, a response concerning the possible presence of a weapon.

Although the safety exception to *Miranda* was not raised by the State, if it had been raised, we would reject its applicability in this matter. The question asked by the police in referencing the bulge in defendant's sock was "what's this?" That question was not narrowly tailored to prompt a response concerning the possible presence of a weapon or aimed at protecting the safety of the police.

## V.

We turn next to the State's claim that it was error for the Appellate Division to entertain defendant's ineffective assistance of counsel claim and to remand for a suppression hearing. Before the Appellate Division, defendant argued that his trial counsel was ineffective for failing to file a motion to suppress the seizure of the drugs. The State argued that pursuant to *Rule* 3:5–7(f), if a motion to suppress is not timely made, the right to file the motion is considered waived. *R.* 3:5–7(f) ("If a timely motion [to suppress] is not made in accordance with this rule, the defendant shall be deemed to have waived any objection during trial to the admission of evidence on the ground that such evidence was unlawfully obtained.").

 In order to satisfy the *Strickland*[4] standard when an ineffective assistance of counsel claim is based on the failure to file a suppression motion, a defendant must establish "that his Fourth

---

[4] *Strickland v. Washington,* 466 *U.S.* 668, 687, 104 *S.Ct.* 2052, 2064, 80 *L.Ed.*2d 674, 693 (1984).

Amendment claim is meritorious." *State v. Fisher,* 156 *N.J.* 494, 501, 721 *A.*2d 291 (1998). Because we conclude that the police had probable cause to arrest and search defendant, there is no merit to defendant's Fourth Amendment claim. Simply stated, a motion to suppress the drugs found on defendant would have failed. It is not ineffective assistance of counsel for defense counsel not to file a meritless motion, or as in this case, to waive the hearing on the motion to suppress. Consequently, we need not address defendant's ineffective assistance of counsel argument or the State's claim that defendant is procedurally barred from raising his motion to suppress.

## VI.

Finally, we find no merit to defendant's argument that his four-year, mid-range sentence was excessive.

## VII.

The judgment of the Appellate Division is reversed. We remand to reinstate the judgment of conviction and sentence.

Justice RIVERA–SOTO, concurring in the result.

This street-level drug trafficking case requires that we address the legal consequences arising from the everyday interactions between suspected drug sellers and the police, which result in both incriminating statements by a drug dealer and the seizure of drugs. Specifically, we are called on to determine, under these circumstances, what theory applies in respect of the authority of the police to detain, question, and search a person suspected of engaging in drug sales.

The majority concludes that the encounter between defendant Rahmil O'Neal and the police must be gauged under the probable cause standard, a conclusion that places defendant in a custodial

setting and, hence, triggers the requirement of *Miranda*[1] warnings prior to any interrogation. *Ante,* 190 *N.J.* 606, 921 *A.*2d 1082 (2007). The majority, however, concludes that any violation of the *Miranda* requirements here was harmless and, thus, reinstates defendant's convictions and sentence. *Ibid.*

Although I concur in the result reached by the majority, I differ in respect of the analysis to be applied either to defendant's motion to suppress the statement he made to the police that he had a bag of cocaine at his ankle or defendant's motion to suppress the cocaine seized from him. As to the former, I conclude that defendant's statement made in response to police inquiries during a *Terry* "stop-and-frisk," was not the product of a custodial interrogation and, therefore, was not subject to suppression pursuant to *Miranda* and *State v. Stott,* 171 *N.J.* 343, 364–65, 794 *A.*2d 120 (2002).

In respect of defendant's motion to suppress the cocaine seized from him, I conclude as a threshold matter that "[i]f a timely motion [to suppress evidence] is not made [by defendant] in accordance with [the *Rules of Court*], the defendant shall be deemed to have waived any objection during trial to the admission of evidence on the ground that such evidence was unlawfully obtained." *Rule* 3:5–7(f). Because defendant first made and later withdrew his motion to suppress the contraband seized from him, that issue was waived and is not available for direct appellate review. Moreover, even if one were to consider defendant's substantive arguments in respect of his belated application to suppress, I conclude that, in the circumstances presented, the contraband retrieved from defendant's person was admissible as the result of a valid "stop-and-frisk" or protective search pursuant to *Terry v. Ohio,* 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968), and *State v. Roach,* 172 *N.J.* 19, 27, 796 *A.*2d 214 (2002), or as the product of a search incident to a lawful arrest pursuant to *Chimel*

---

[1] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

*v. California,* 395 *U.S.* 752, 89 *S.Ct.* 2034, 23 *L.Ed.*2d 685 (1969), and *State v. Moore,* 181 *N.J.* 40, 45–46, 853 *A.*2d 903 (2004).

## I.

The constitutional mandate that "[n]o person ... shall be compelled in any criminal case to be a witness against himself," *U.S. Const.* amend. V, is engrained in the very fabric of our democracy. Indeed, although New Jersey "do[es] not have a similar provision in our State Constitution[,] ... the privilege itself is firmly established as part of the common law of New Jersey and has been incorporated into our *Rules of Evidence." State v. Presha,* 163 *N.J.* 304, 312–13, 748 *A.*2d 1108 (2000) (citations and internal quotation marks omitted; formatting supplied). That mandate provides the governing constitutional rule in respect of the admission of a criminal defendant's oral statements: "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda, supra,* 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 706. For that reason,

[t]he right against self-incrimination, and the corollary requirement that a suspect be informed of that right, are triggered "when an individual is taken into custody or otherwise deprived of his [or her] freedom by the authorities in any significant way and is subject to questioning[.]" *Miranda, supra,* 384 *U.S.* at 478, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726. The requirement that interrogators warn suspects of certain rights is deemed necessary due to the pressure inherent in an *"incommunicado interrogation of individuals in a police-dominated atmosphere[.]" Id.* at 445, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 707.

[*Stott, supra,* 171 *N.J.* at 364, 794 *A.*2d 120.]

Thus, *Miranda's* requirements are triggered as a condition precedent to a valid custodial interrogation, that is, when the police interrogate a person who is in custody. This appeal focuses on the latter factor: was defendant in custody at the time that he responded to the police inquiry and stated that the bulge in his right ankle was a bag of cocaine?

*Miranda* explained that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda, supra,* 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.2d* at 706. In that context,

[w]hether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernible.

It is clear that custody in the *Miranda* sense does not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station.

. . . .

We are satisfied that no precise definition can be formulated which would apply in advance to all cases and prescribe the outer limits of the protection afforded. The problem must be dealt with through a case-by-case approach in which the totality of the circumstances must be examined.

[*State v. Godfrey,* 131 *N.J.Super.* 168, 175–77, 329 *A.2d* 75 (App.Div.1974), *aff'd o.b.,* 67 *N.J.* 267, 337 *A.2d* 371 (1975).]

This Court also has explained that "[t]he critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, and the status of the suspect[.]" *State v. P.Z.,* 152 *N.J.* 86, 103, 703 *A.2d* 901 (1997). Another factor is whether a suspect knew that he or she was a focus of the police investigation. *Stansbury v. California,* 511 *U.S.* 318, 325, 114 *S.Ct.* 1526, 1530, 128 *L.Ed.2d* 293, 300 (1994); *State v. Pearson,* 318 *N.J.Super.* 123, 134, 723 *A.2d* 84 (App.Div.1999).

[*Stott, supra,* 171 *N.J.* at 364–65, 794 *A.2d* 120.]

The Supreme Court of the United States has made clear that the determination of whether a person is in custody is an objective one that is independent of "the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California, supra,* 511 *U.S.* at 323, 114 *S.Ct.* at 1529, 128 *L.Ed.2d* at 298. Stated bluntly, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody[.]' " *Berkemer v. McCarty,* 468 *U.S.* 420, 442, 104 *S.Ct.* 3138, 3151, 82 *L.Ed.2d* 317, 336 (1984).

The calculus of whether a police-citizen encounter rises to the level of a custodial interrogation requires a discerning view, for not all police-citizen encounters trigger *Miranda's* requirements. One category of encounter that does not rise to the custodial

interrogation level required by *Miranda* is a "stop-and-frisk" pursuant to *Terry v. Ohio, supra,* 392 *U.S.* at 22, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906–07. *Terry* explains that police officers "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Ibid.* For their protection, *Terry* permits police officers to conduct a warrantless, but nonetheless "carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Id.* at 30, 88 *S.Ct.* at 1884–85, 20 *L.Ed.*2d at 911. In doing so,

> [t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.
>
> [*Id.* at 27, 88 *S.Ct.* at 1883, 20 *L.Ed.*2d at 909 (citations and footnote omitted).]

The *Terry* "stop-and-frisk" exception to the warrant requirement has been incorporated into and made part of New Jersey's constitutional doctrine. *State v. Valentine,* 134 *N.J.* 536, 543, 636 *A.*2d 505 (1994) (citing New Jersey cases adopting *Terry* "stop-and-frisk" exception to constitutional warrant requirement, explaining that "we do not interpret the New Jersey Constitution to demand a higher standard than the Fourth Amendment in order to justify a frisk incident to a lawful investigatory stop"). Describing the *Terry* exception instead by its rationale as the "protective search exception," it has been observed that

> [t]he protective search exception to the warrant requirement was created to protect an officer's safety where there is reason to believe that a suspect is armed and dangerous. The exception allows a law enforcement officer to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. Specifically, the officer may conduct a carefully limited search of the outer clothing in an attempt to discover weapons which might be used to assault him. The search must, however, be confined in scope to an intrusion reasonably designed to discover weapons that might be used to assault the police officer. Therefore, in order to conduct a protective search, an officer must have a specific and particularized basis for an objectively reasonable suspicion that defendant was armed and dangerous. The existence of an objective-

ly reasonable suspicion is based on the totality of the circumstances. The totality of the circumstances test balances the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions. Because the intrusion is designed to protect the officer's safety, the standard governing protective searches is whether a reasonably prudent man in the circumstances would be warranted in his belief that his safety or that of others was in danger.

The standard does not deal with hard certainties, but with probabilities and common-sense conclusions about human behavior.

Oftentimes law-enforcement officers must make instantaneous decisions about whether a frisk for weapons is justifiable. The task is an unenviable one often fraught with life-and-death consequences. Courts should not set the test of sufficient suspicion too high when the protection of the investigating officer is at stake.

Accordingly, courts have upheld seizures of unidentifiable objects on a suspect's person where a lawful pat-down is either inconclusive or impossible. The reasoning in such cases is that the officer's safety is paramount and that the officer is justified in taking further steps if necessary to protect his safety:

Clearly, a police officer does not need to perceive tactile recognition of a firearm before he may protect himself further by insisting on deliverance of the suspected weapon. It is not even necessary for him to identify by species the object of his concern, so long as the fear for his safety resulting from the pat-down is reasonable. A police officer is not required by his occupation or the Constitution of the United States to take unnecessary risks in the performance of his duties or to refrain from the taking of necessary measures to determine whether the person is in fact carrying a weapon (or the neutralizing of a) threat of physical harm.

[*State v. Roach*, 172 *N.J.* 19, 27–28, 796 *A*.2d 214 (2002) (citations, internal quotation marks, and editing marks omitted; formatting supplied).]

In determining whether a police officer's actions in conducting a protective search are reasonable, this Court repeatedly has made clear that the standard to be applied is an objective one. As *State v. Arthur*, 149 *N.J.* 1, 7, 691 *A*.2d 808 (1997), explains, "[t]he standards by which the reasonableness of police conduct involving an investigatory stop of a person or an automobile originate with *Terry v. Ohio*[.]"

The facts used in that balancing test are to be judged objectively: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate? When determining if the officer's actions were reasonable, consideration must be given to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. Neither "inarticulate hunches" nor an arresting officer's subjective good faith can justify an infringement of a citizen's constitutionally

guaranteed rights. Rather, the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.

[*Id.* at 7–8, 691 A.2d 808 (citations, internal quotation marks, and editing marks omitted).]

*See also State v. Smith,* 155 *N.J.* 83, 91, 713 A.2d 1033, *cert. denied,* 525 *U.S.* 1033, 119 *S.Ct.* 576, 142 *L.Ed.*2d 480 (1998) (holding that "[a] protective search does not entail a general search of the person for evidence of crime; rather it is designed to discover weapons that could be used to assault the officer [and it] may be based on reasonable articulable suspicion that a suspect is armed and dangerous" (citations and internal quotation marks omitted)); *State v. Thomas,* 110 *N.J.* 673, 677, 542 A.2d 912 (1988) (rejecting analysis based on "the *subjective* factors that might prompt a law-enforcement official to search a suspect who is the subject of a lawful investigatory stop and is thought to pose a threat to the officer's safety" and adopting test of "whether the record contains sufficient evidence of *objective* criteria to support the search of defendant, which in turn determines the admissibility of the evidence seized"); *State v. Bruzzese,* 94 *N.J.* 210, 219, 221, 463 A.2d 320 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984) (holding that "the proper inquiry for determining the constitutionality of a search-and-seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his or her underlying motives or intent" and explaining basis for rejecting analysis of police officer's subjective intent because "practically every search-and-seizure case would require the court to engage in a costly and time-consuming expedition into the state of mind of the searching officer").

In this context, objective evidence of drug dealing gives rise to a fair, objective inference that weapons also are present. *See State v. Spivey,* 179 *N.J.* 229, 240, 844 A.2d 512 (2004) (citing Report to the Governor by the Attorney General on the Need to Update the Comprehensive Drug Reform Act of 1987 (Dec. 9, 1996) (stating that "[f]irearms have become ubiquitous in the world of illegal drug activity. Dealers are armed to protect themselves from law

enforcement officers, from other dealers and from their customers")). Other jurisdictions likewise have made the sad but logical connection between drug dealing and the presence of weapons. *See, e.g., United States v. Hishaw,* 235 *F.*3d 565, 570 (10th Cir.2000), *cert. denied,* 533 *U.S.* 908, 121 *S.Ct.* 2254, 150 *L.Ed.*2d 241 (2001) ("[T]he evidence supporting the officers' reasonable suspicion that [the defendant] was distributing drugs ... also indicated that [the defendant] might be armed and dangerous."); *Louisiana v. James,* 795 *So.*2d 1146, 1150 (La.2000) (stating that "the frequent association of narcotics trafficking with firearms justified the officer's brief, self-protective frisk"); *Abraham v. Oklahoma,* 962 *P.*2d 647, 647 (Okla.Crim.App.1998) (stating that "as the offense reported was an offer to sell drugs, the officer had an adequate basis for conducting a weapons search").

A fair application of the objective standard governing the protective search—or *Terry* frisk—to the facts in this case leads to the conclusion that defendant was not in custody at the time that he made his incriminating statement and, as a result, the prerequisites for the issuance of *Miranda* warnings had not been triggered. Cantalupo explained that, after observing what appeared to be two separate hand-to-hand drug transactions conducted by defendant, he approached defendant. Cantalupo noted that his intention "was to investigate whether or not [defendant] was, in fact, selling drugs." As Cantalupo next explained during cross-examination at the suppression hearing:

Q. Well, at that point you didn't feel you had sufficient probable cause to arrest my client?

A. I thought I had enough suspicion to approach your client. Absolutely. I didn't—at the time, like I said, it—to me, in my eyes, it was suspected cocaine. Once I approached and found that cocaine, that was my definite evidence that he was going to be placed under arrest.

Cantalupo also explained that, although defendant was not detained until the cocaine was found on his person, defendant was not free to leave during that initial questioning, but that defendant was not arrested until the cocaine was found.

In these circumstances, the trial court correctly determined that "the description of what happened here up to the point of the question that resulted in the incriminating answer was not a custodial interrogation." I also agree with the trial court's analysis that "the issue still is what a reasonable person, innocent of crime in the defendant's position, would have thought." To that extent, the Appellate Division properly held that "based on all the circumstances, a reasonable person would not have believed that he was under arrest when Officer Cantalupo asked him what was around his ankle" and, because "there was no need for *Miranda* warnings at that point, . . . defendant's response was admissible as evidence."

## II.

### A.

Defendant also claims that his trial counsel was ineffective because she did not move to suppress the bag of cocaine seized from defendant's ankle. The Appellate Division concluded that such failure meant that 'defendant's trial counsel was ineffective and, for that reason, remanded the matter for a new suppression hearing. I disagree. Because defendant in fact made and later withdrew a motion to suppress the cocaine seized from him, *Rule* 3:5–7(f) bars consideration of defendant's claim on his direct appeal.

Our *Rules of Court* specifically require that

> [o]n notice to the prosecutor of the county in which the matter is pending or threatened, to the applicant for the warrant if the search was with a warrant, and to co-indictees, if any, and in accordance with the applicable provisions of *R.* 1:6–3 and *R.* 3:10, a person claiming to be aggrieved by an unlawful search and seizure and having reasonable grounds to believe that the evidence obtained may be used against him or her in a penal proceeding, may apply to the Superior Court only and in the county in which the matter is pending or threatened to suppress the evidence and for the return of the property seized even though the offense charged or to be charged may be within the jurisdiction of a municipal court.

[*Rule* 3:5–7(a).]

That *Rule* is not self-executing, and the failure to comply by its terms bears the mandatory consequential sanction of waiver. *Rule* 3:5–7(f) ("If a timely motion [to suppress] is not made in accordance with this rule, the defendant shall be deemed to have waived any objection during trial to the admission of evidence on the ground that such evidence was unlawfully obtained.").

Erroneously concluding that "defendant is not attempting to litigate a waived argument[,]" the Appellate Division rejected the State's assertion of the *Rule* 3:5–7(f) bar, relying instead on defendant's assertion that he was challenging his counsel's effectiveness in failing to file a suppression motion, and not the results of that suppression motion itself. Ironically, in order to reach defendant's ineffective assistance of counsel claim, the Appellate Division perforce was required to consider the merits of defendant's suppression claim. Doing so, the panel concluded that "defendant's Fourth Amendment suppression challenge has merit." Thus, the Appellate Division permitted defendant to raise an indirect suppression challenge under the guise of an ineffective assistance of counsel claim when a direct challenge otherwise was barred. That it did so became obvious by the unique remedy the panel fashioned: a remand for a suppression hearing only.

If it is to have any meaning, then *Rule* 3:5–7(f) must mean precisely what it says. If a defendant fails to prosecute a motion to suppress in a timely manner, the immediate consequences are clear: "the defendant shall be deemed to have waived any objection during trial to the admission of evidence on the ground that such evidence was unlawfully obtained." Because a defendant whose counsel fails to advance a suppression motion cannot be entirely without a remedy, that consequence cannot be draconian and, instead, must be limited to a defendant's direct appeal. Thus, a defendant nevertheless may claim that his or her counsel's failure to prosecute a motion to suppress was constitutionally ineffective such as to warrant post-conviction relief. An ineffective assistance of counsel claim cannot serve as a subterfuge on direct appeal for the failure to prosecute a suppression motion.

That said, however, because the Appellate Division found merit in defendant's claim of ineffective assistance of counsel, I address that claim substantively.

### B.

The rules governing ineffective assistance of counsel claims have been oft-repeated. As a matter of constitutional mandate, "a criminal defendant is entitled to the assistance of reasonably competent counsel, and that if counsel's performance has been so deficient as to create a reasonable probability that these deficiencies materially contributed to defendant's conviction, the constitutional right will have been violated." *State v. Fritz*, 105 *N.J.* 42, 58, 519 *A.*2d 336 (1987). Whether a defendant's constitutional right to competent counsel has been abridged is measured by applying "a simple, two-part test[,]" *id.* at 52, 519 *A.*2d 336, plainly set forth in *Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984):

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

[*Id.* at 687, 104 *S.Ct.* at 2064, 80 *L.Ed.*2d at 693.]

In addition, when presenting a claim of ineffective assistance of counsel due to the failure to file a constitutionally-based suppression motion, "the defendant not only must satisfy both parts of the *Strickland* test but also must prove that his Fourth Amendment claim is meritorious." *State v. Fisher*, 156 *N.J.* 494, 501, 721 *A.*2d 291 (1998) (citing *Kimmelman v. Morrison*, 477 *U.S.* 365, 375, 106 *S.Ct.* 2574, 2583, 91 *L.Ed.*2d 305, 319 (1986)). Those three factors—whether defense counsel's performance was deficient, whether defendant was prejudiced as a result, and whether defendant's Fourth Amendment-based constitutional claim had merit in

the first instance—must be addressed both in order and in their proper context.

Unlike the factual predicate presented to the Appellate Division and upon which the panel reasonably but mistakenly relied, it is now beyond doubt that defendant's counsel in fact did file a pretrial motion to suppress both the statements defendant made prior to being placed under arrest as well as the cocaine seized from · defendant's right ankle. Six weeks later, in a written pretrial memorandum signed by defendant, defendant's counsel, the prosecutor, and the trial judge, defendant waived his motion to suppress in all respects. On the first day of trial, the trial court reviewed the pretrial memorandum on the record and noted that "[t]here are no pretrial motions." Cautioning counsel that if "anybody disagrees [with] any of my statements, they should yell out[,]" the only exception arose when defense counsel noted that there was "a verbal admission" by defendant. The following colloquy ensued:

> THE COURT: [A]re we going to have a hearing outside the presence of the jury regarding the admissibility of that statement if the State wishes to have it, or do you not see the need for that? Rule 104(c),[2] if there's a statement of a defendant being used, there's an entitlement to a hearing if they really want to raise the issue and if you want to hold such a hearing outside the presence of the jury. [DEFENSE COUNSEL]: I don't think that will be necessary as a trial tactic, Your Honor.

The prosecutor explained that he intended to introduce two separate statements made by defendant: when, in response to the

---

[2] *N.J.R.E.* 104(c), titled "Preliminary Hearing on Admissibility of Defendant's Statements," provides that

> [w]here by virtue of any rule of law a judge is required in a criminal action to make a preliminary determination as to the admissibility of a statement by the defendant, the judge shall hear and determine the question of its admissibility out of the presence of the jury. In such a hearing the rules of evidence shall apply and the burden of persuasion as to the admissibility of the statement is on the prosecution. If the judge admits the statement the jury shall not be informed of the finding that the statement is admissible but shall be instructed to disregard the statement if it finds that it is not credible. If the judge subsequently determines from all of the evidence that the statement is not admissible, the judge shall take the appropriate action.

police officer's initial inquiry of "what's going on," defendant said "I didn't do nothing wrong[,]" and when, in response to the police officer's question during the protective search as to what the bulge in defendant's right ankle was, defendant said it was a bag of cocaine. The trial court then clarified that those statements would not "be the subject of a [*Rule* 104(c)] hearing [as] a matter of defense strategy." To this, defense counsel responded: "Correct."

In light of these facts, defendant was not deprived of the level of competent counsel that is constitutionally required. As explained above, *supra*, 190 *N.J.* at 607–15, 921 *A.2d* at 1083–87 (2007), defendant's first detention was solely an investigative stop coupled with a protective search or, in other words, a garden-variety *Terry* "stop-and-frisk." Indeed, "a bulge alone has been held sufficient to validate a protective pat-down." *State v. Smith*, 134 *N.J.* 599, 621, 637 *A.2d* 158 (1994) (citing *Pennsylvania v. Mimms*, 434 *U.S.* 106, 111–12, 98 *S.Ct.* 330, 334, 54 *L.Ed.2d* 331, 337–38 (1977), and *State v. Wanczyk*, 201 *N.J.Super.* 258, 264, 493 *A.2d* 6 (App.Div. 1985)). Moreover, " '[m]. because a trial strategy fails does not mean that counsel was ineffective.' " *State v. DiFrisco*, 174 *N.J.* 195, 220, 804 *A.2d* 507 (2002) (quoting *State v. Bey (V)*, 161 *N.J.* 233, 251, 736 *A.2d* 469 (1999)). *See also State v. Davis*, 116 *N.J.* 341, 357, 561 *A.2d* 1082 (1989) (holding that "[i]n assessing the adequacy of counsel's performance, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" (citation and internal quotation marks omitted)).

When gauged against these standards, defendant's ineffective assistance of counsel claim fails. As a seizure made as a consequence of a valid *Terry* "stop-and-frisk," the cocaine seized from defendant's right ankle was clearly and unmistakably admissible. Defense counsel's performance was not deficient and instead was the product of legitimate defense strategy. In the end, defendant was not prejudiced by the failure of defense counsel to prosecute what would have been a failed motion to suppress, and any motion

to suppress the cocaine was clearly lacking in merit and was doomed from the outset.

Finally, in the context of the merits of defendant's ineffective assistance of counsel claim, the State also argues that the seizure of the cocaine from defendant's right ankle was proper as a search incident to a lawful arrest, a proposition the Appellate Division rejected. I agree with the State and conclude that the search of defendant's ankle also was justified as a search incident to a lawful arrest.

Based on *Chimel v. California, supra,* 395 *U.S.* at 763, 89 *S.Ct.* at 2040, 23 *L.Ed.*2d at 694, and its progeny, "[w]hen a valid arrest based on probable cause has been made, a police officer is entitled to search the arrestee's person in order to protect himself and to insure that evidence is not destroyed." *State v. Sims,* 75 *N.J.* 337, 352, 382 *A.*2d 638 (1978). *See also State v. Gray,* 59 *N.J.* 563, 569, 285 *A.*2d 1 (1971) ("It is well settled that pursuant to a valid arrest a police officer may search a defendant and the area within his reach to protect himself from attack, to prevent escape or to prevent destruction of the evidence or fruits of a crime."). Moreover, the *fact* of an arrest need not precede the search in order for that search to be lawfully incident to an arrest. Instead, "[t]he *right* to arrest must pre-exist the search [and that o]fficers cannot search in order to arrest, nor arrest because of the product of the search." *State v. Doyle,* 42 *N.J.* 334, 342, 200 *A.*2d 606 (1964) (emphasis supplied). In other words, "[a] search undertaken merely for the purpose of uncovering evidence with which to arrest and convict of crime is not made lawful because the desired evidence is obtained." *Ibid.*

> This is not to say that where an arrest is valid independently of, and is not made to depend on, the search or its result, evidence produced by a search will be suppressed simply because in precise point of time the arrest does not precede the search. It is sufficient if the valid arrest and search are reasonably contemporaneous, that is, they occur as parts of a single transaction, as connected units of an integrated incident. In such a setting a search should not be condemned as constitutionally unreasonable.
>
> [*Id.* at 343, 200 *A.*2d 606.]

The operative events in this case were clear: two police officers observed defendant engaging in what appeared to be two separate hand-to-hand drug transactions. Those observations caused the officers to approach defendant, and led one of the officers to remark on the bulge located on defendant's right ankle. Once defendant identified the bulge on his right ankle as a bag of cocaine and the bag was retrieved by the police officer, defendant "was immediately handcuffed and placed into custody."

Because "[t]he probable-cause requirement is the constitutionally-prescribed standard for distinguishing unreasonable searches from those that can be tolerated in a free society[,]" *State v. Novembrino*, 105 *N.J.* 95, 106, 519 *A.2d* 820 (1987), the inquiry into determining whether the search of defendant was made incident to a lawful arrest is limited: "we need decide only whether the facts found by the trial court provided probable cause to arrest defendant[.]" *State v. Moore*, 181 *N.J.* 40, 45, 853 *A.2d* 903 (2004). The following principles guide whether the facts provided probable cause:

> Probable cause exists if at the time of the police action there is a well-grounded suspicion that a crime has been or is being committed. The standard defies scientific precision. We have explained, however, that it requires nothing more than a practical, common-sense decision whether, given all the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place.
>
> [*State v. Nishina*, 175 *N.J.* 502, 515, 816 *A.2d* 153 (2003) (citations, internal quotation marks, and editing marks omitted).]

It is beyond question that Cantalupo and Bullock observed defendant engage in two separate and independent hand-to-hand drug transactions on an open sidewalk; that once the police officers approached defendant, his customer fled behind a locked metal door and defendant attempted to disguise his behavior by faking a non-existent telephone call; that when the officers simply asked him "what's going on," defendant's immediate reply was "I didn't do nothing wrong;" and that when asked about the bulge in the sock on his right ankle, defendant volunteered that it was a "bag of cocaine."

The aggregate of those facts clearly and unequivocally establish that the police officers had more than sufficient probable cause to arrest defendant before they actually searched his ankle and seized the cocaine hidden there. It is also beyond peradventure that the search and defendant's arrest, although occurring in that chronological order, were contemporaneous. Because the linchpin for a valid search incident to a lawful arrest is the presence of probable cause, and because there clearly was probable cause for defendant's arrest before the officers seized the cocaine on defendant's ankle, the search of defendant also was justified as a valid search incident to a lawful arrest.

## C.

Precious few rights are more deserving of constitutional dignity than a criminal defendant's right to counsel: that right is recognized explicitly in both the Sixth Amendment to the Constitution of the United States and Article I, paragraph 10 of the New Jersey Constitution. *U.S. Const.* amend. VI ("In all criminal prosecutions, the accused shall ... have the assistance of counsel for his defence."); *N.J. Const.* art. I, ¶ 10 ("In all criminal prosecutions the accused shall ... have the assistance of counsel in his defense."). For that reason, a claim that a criminal defendant's rights were burdened by ineffective counsel is entitled to and does receive careful judicial scrutiny.

It has been a consistent feature of our law that "[i]neffective-assistance-of-counsel claims are particularly suited for post-conviction review because they often cannot reasonably be raised in a prior proceeding." *State v. Preciose,* 129 *N.J.* 451, 460, 609 *A.*2d 1280 (1992). This is so because ineffective assistance of counsel claims "involve allegations and evidence that lie outside the trial record." *State v. Castagna,* 187 *N.J.* 293, 313, 901 *A.*2d 363 (2006). However, that rule is not absolute: "when the trial itself provides an adequately developed record upon which to evaluate defendant's claims, appellate courts may consider the issue on direct appeal." *Ibid.* (citing *State v. Allah,* 170 *N.J.* 269, 285, 787 *A.*2d

887 (2002)). *See also State v. Murray,* 162 *N.J.* 240, 247–48, 744 *A.*2d 131 (2000) (explaining that bar to ineffective assistance of counsel claims on direct appeal is based on recognition that such claims "often cannot reasonably be raised in a prior proceeding" (quoting *Preciose, supra,* 129 *N.J.* at 460, 609 *A.*2d 1280)).

This trial record discloses that defense counsel made but later withdrew defendant's suppression motion, the latter action having been done with defendant's concurrence in writing. Defense counsel explained that the withdrawal of the suppression motion was made as a matter of "trial tactics" and "defense strategy." For those reasons, I concur substantively with the majority's conclusion that because "there is no merit to defendant's Fourth Amendment claim[,]" and because "a motion to suppress the drugs found on defendant would have failed[,]" "it is not ineffective assistance of counsel for defense counsel not to file a meritless motion, or as in this case, to waive the hearing on the motion to suppress." *Ante,* at 619, 921 *A.*2d at 1089.[3]

## III.

In sum, in respect of defendant's motion to suppress the statement he made to the police that he had a bag of cocaine at his ankle, I conclude that defendant's statement made in response to police inquiries during a *Terry* stop was not the product of a custodial interrogation and, therefore, was not subject to suppression. Further, in respect of defendant's motion to suppress the cocaine seized from him, I conclude as a threshold matter that if a timely motion to suppress evidence is not made by a defendant in accordance with the *Rules of Court,* the defendant is deemed to have waived any objection during trial to the admission of evidence on the ground that such evidence was unlawfully obtained. Because defendant first made and later withdrew his motion to

---

[3] However, for the reasons I have noted, I do not join in the majority's conclusion that "we need not address defendant's ineffective assistance of counsel argument or the State's claim that defendant is procedurally barred from raising his motion to suppress." *Ibid.*

suppress the contraband seized from him, that issue was waived and is not available for appellate review. Furthermore, even if one considers defendant's substantive arguments in respect of his belated application to suppress, I conclude that, in the circumstances presented, the contraband retrieved from defendant's person was admissible as either the result of a valid "stop-and-frisk" or "protective search," or as the product of a search incident to a lawful arrest. Finally, for all those reasons, I reject defendant's ineffective assistance of counsel claims.

*For reversal and reinstatement*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.